# In the United States Court of Federal Claims

No. 17-1915V
(Filed Under Seal: March 18, 2025)[1]
Reissued: April 2, 2025

|  |  |
|---|---|
| ANGELA APUZZO, | ) |
|  | ) |
| Petitioner, | ) |
|  | ) |
| v. | ) |
|  | ) |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | ) |
|  | ) |
| Respondent. | ) |
|  | ) |

## OPINION & ORDER

*Meredith Daniels*, Conway Homer, P.C., Boston, MA, for petitioner. Also represented by Ronald Craig Homer.

*Debra A. Filteau Begley*, Vaccine/Torts Branch, Civil Division, United States Department of Justice, Washington, D.C., for respondent.

## *SMITH*, Senior Judge

This case concerns how the Office of Special Masters at the United States Court of Federal Claims must evaluate competing expert opinions in vaccine injury cases. Special Master Daniel T. Horner denied compensation to petitioner, Ms. Angela Apuzzo, because he concluded—after reviewing the respective expert reports submitted by both respondent, the Secretary of Health and Human Services, and Ms. Apuzzo—that she suffers from Sjögren's Syndrome, rather than her alleged acute-onset chronic inflammatory demyelinating polyneuropathy ("CIDP"), caused by an influenza vaccination on September 17, 2015. *See generally Apuzzo v. Sec'y of Health & Hum. Servs.*, No. 17-1915V, 2024 WL 4534200 (Off. Spec. Mstr. Sept. 20, 2024). To Ms. Apuzzo, the Special Master's conclusion violates binding precedent instructing special masters not to "conduct a differential diagnosis" by choosing one expert's opinion over another, "or over a combination of" expert and treating physicians' opinions. *See generally* Petitioner's Memorandum in Support of Her Motion for Review the Special Master's September 20, 2024, Decision, ECF No. 166 [hereinafter Pet'r's Mot.].

---

[1]     This opinion was issued under seal on March 18, 2025. The parties were given an opportunity to propose redactions before public release, but no such proposals were made.

The Court disagrees. Special Master Horner was required to evaluate the reliability of the parties' expert reports because, in contrast to respondent's experts, neither Ms. Apuzzo's treating physicians nor her experts agreed on the proper diagnosis for her symptoms. *See, e.g.*, *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1356 (Fed. Cir. 2006) (holding that it is not arbitrary and capricious for a special master to conclude that a claimant did not prove causation by reviewing and comparing the expert evidentiary record); *Lombardi v. Sec'y of Health & Hum. Servs.*, 656 F.3d 1343, 1353–54 (Fed. Cir. 2011) (same). The Special Master's decision is therefore affirmed.

**I**

On September 17, 2015, Ms. Apuzzo received the influenza vaccination at issue. *Apuzzo*, 2024 WL 4534200, at *4. On October 5, 2015, Ms. Apuzzo was reviewed by emergency health professionals after she complained of four days of numbness and tingling in her hands, feet, and the right side of her face. *Id.* The emergency health professionals "suspected" hypothyroidism but suggested that she follow up with a neurologist due to her mild peripheral neuropathy. *Id.* On October 28, 2015, Ms. Apuzzo met with Dr. Bronfin,[2] a neurologist. *Id.* "Dr. Bronfin diagnosed Guillain-Barré Syndrome . . . and peripheral demyelinating neuropathy." *Id.* (acronym omitted). That same day, based on Dr. Bronfin's diagnosis, Ms. Apuzzo returned to the emergency health professionals and was transferred to inpatient neurologic observation at a hospital. *Id.* During her hospitalization, Ms. Apuzzo's blood test results "were significant for positive antinuclear antibodies . . . and elevated anti-Sjögren's syndrome-related antigen A antibodies," but no tests definitively determined that she suffered from Guillain-Barré Syndrome. *Id.* Ms. Apuzzo then had a rheumatological consultation to address possible Sjögren's Syndrome. *Id.* "Given her history of arthritis and positive Sjögren's Syndrome antibodies, as well as the fact [Guillain-Barré Syndrome] was not definitively diagnosed, rheumatology considered Sjögren's [S]yndrome as a possible explanation for petitioner's peripheral neuropathy and recommended continuing to treat for [Guillain-Barré Syndrome] while monitoring for Sjögren's [S]yndrome." *Id.* The consultant recommended that Ms. Apuzzo follow-up to determine if Sjögren's Syndrome was main cause of her symptoms. *Id.* On November 3, 2015, Ms. Apuzzo was discharged from the hospital with a diagnosis of Guillain-Barré Syndrome and peripheral demyelinating neuropathy. *Id.*

On November 17, 2025, Ms. Apuzzo returned to Dr. Bronfin because she was still experiencing numbness, tingling, and a tremor. *Id.* at *5. After reviewing Ms. Apuzzo, "Dr. Bronfin maintained his diagnoses of [Guillain-Barré Syndrome] and peripheral demyelinating neuropathy, but also added Sjögren's [S]yndrome to his assessment." *Id.* Dr. Bronfin then prescribed a series of treatments that tended to cause improvements in Ms. Apuzzo's condition. *Id.*

---

[2] Special Master Horner's decision only uses last names for certain physicians. Where a first name is used, the Court does so as well.

On January 19, 2016, Ms. Apuzzo was evaluated by a rheumatologist, Dr. Lee. *Id.* Finding Ms. Apuzzo to be positive for Sjögren's Syndrome antibodies, Dr. Lee determined that her condition could be presented with peripheral neuropathy, but decided to wait on performing more tests to confirm this diagnosis, given Ms. Apuzzo's apparent improvement in response to Dr. Bronfin's treatment plan. *Id.* Ms. Apuzzo was to contact Dr. Lee again if her condition stopped improving or became worse. *Id.*

On February 1, 2016, Ms. Apuzzo returned to Dr. Bronfin, complaining of increased weakness and shortness of breath. *Id.* He found that Ms. Apuzzo was neurologically stable but refered her to emergency health services due to her shortness of breath. *Id.* The hospital conducted a series of tests, which ruled out Guillain-Barré Syndrome, and now offered CIDP as a possible cause for Ms. Apuzzo's symptoms. *Id.* On March 8, 2016, Ms. Apuzzo once again returned to Dr. Bronfin due to her condition "not improving," and Ms. Apuzzo continued her treatment plan under Dr. Bronfin's unchanged diagnosis of Sjögren's Syndrome, Guillain-Barré Syndrome, and peripheral demyelinating neuropathy. *Id.* (internal quotation marks omitted).

Between March 21, 2016, and August 22, 2017, Ms. Apuzzo saw at least four different specialists. *Id.* at *6–7. On March 21, 2016, Ms. Apuzzo visited Dr. Busono, a neuromuscular specialist, who, after diagnostic testing, began to "doubt the diagnosis of CIDP," and Dr. Bronfin's treatment plan was discontinued as a result. *Id.* at *6 (internal quotation marks omitted). In August of 2016, Ms. Apuzzo consulted Dr. Kapur, a neurologist, who restarted Dr. Bronfin's treatment with additional treatments prescribed, and Ms. Apuzzo was to return to Dr. Kapur once he received her medical records. *Id.* On October 4, 2016, Ms. Apuzzo visited Dr. Kapur for a second time. *Id.* During the visit, Dr. Kapur noted that Ms. Apuzzo still had Sjögren's Syndrome antibodies, so her symptoms "could be consistent with either CIDP or small fiber neuropathy related to Sjögren's [S]yndrome," and recommended that Ms. Apuzzo continue her already prescribed treatment plan. *Id.* On February 3, 2017, Ms. Apuzzo met with another neurologist, Dr. Vukic, who ordered a series of examinations. *Id.* After this series of examinations in February of 2017, Dr. Vukic "maintained" the CIDP diagnosis. *Id.* On August 22, 2017, Ms. Apuzzo saw a different neurologist, Dr. Ma, who determined that her symptoms might be associated with either CIDP, Sjögren's Syndrome, or hypothyroidism. *Id.* at *7.

From September 22 to 25 to October 2 to 8, 2017, Ms. Apuzzo twice visited a hospital for worsening weakness, fatigue, and shortness of breath. *Id.* The hospital's neurological "impression" believed her to be suffering from CIDP and Sjögren's Syndrome. *Id.* After these hospital visits, she returned to Dr. Vukic and a neuromuscular specialist, Dr. Brannagan multiple times, where her treatment plan changed repeatedly from late 2017 until spring of 2018. *Id.*

On April 13, 2018, Ms. Apuzzo visited Dr. Brannagan again. *Id.* Dr. Brannagan, in consultation with Dr. Vukic, concluded that her symptoms were not consistent with CIDP and therefore recommended a skin biopsy for Sjögren's Syndrome. *Id.* ("Dr. Vukic then noted that Dr. Brannagan does not believe petitioner has CIDP and therefore

concluded that [t]he cause of her symptoms remains elusive." (internal quotation marks omitted)). On April 30, 2018, Ms. Apuzzo had a skin biopsy for Sjögren's Syndrome. *Id.* at *8. On August 2, 2018, a rheumatologist, Dr. Kepecs, diagnosed Ms. Apuzzo with, at least, Sjögren's Syndrome based on review of her medical record, biopsy results, and a family history of autoimmune issues. *Id.* Dr. Kepecs put Ms. Apuzzo on an autoimmune treatment plan. *Id.*

On October 15, 2018, Ms. Apuzzo was again admitted to the hospital, where hospital staff treated her for assumed CIDP issues. *Id.* Dr. Vukic was informed of Ms. Apuzzo's hospital visit and considered her condition "elusive." *Id.* (internal quotation marks omitted). On December 11, 2018, Dr. Vukic remarked that he believed her condition was a "direct result of her prior [influenza] immunization." *Id.* (internal quotation marks omitted).

On June 30, 2019, after moving to the State of Florida, Ms. Apuzzo visited emergency health services and informed the staff of her previous diagnoses. *Id.* Between July 2019, and February 2020, Ms. Apuzzo visited multiple physicians: Dr. Sonbol; Dr. Suresh; Dr. Lee; and Dr. Hurst. *Id.* at *8–9. All four physicians treated Ms. Apuzzo for either CIDP or generalized neuropathy. *Id.*

On October 22, 2020, Ms. Apuzzo returned to Dr. Vukic. *Id.* at *9. Based on the symptoms she had while in Florida, Dr. Vukic determined Ms. Apuzzo to have some type of small fiber polyneuropathy, and recommend she undergo a series of medical tests. *Id.* But these tests resulted in nothing medically "remarkable." *Id.* On January 5, 2021, Dr. Vukic recommended treatment for CIDP. *Id.* Until July 6, 2021, Ms. Apuzzo's condition was seemingly improving, but she started to have increased neurological issues, like memory lapses, so Dr. Vukic ordered more medical tests. *Id.* Shortly thereafter, on August 23, 2021, Ms. Apuzzo switched neurologists from Dr. Vukic to Dr. Dover. *Id.* at *10. Dr. Dover ordered more medical testing and did not change Ms. Apuzzo's medical treatment plan during his examinations of her in December 2021 and in February 2022. *Id.* Dr. Dover eventually diagnosed Ms. Apuzzo with CIDP. *Id.*

On November 9, 2022, Ms. Apuzzo saw a multiple sclerosis specialist, Dr. Sylvester, who conduct a neurological exam and was willing to prescribe additional autoimmunity condition treatments. *Id.* The record does not state whether these treatments were ever administered.

**II**

On December 8, 2017, Ms. Apuzzo filed her petition against respondent, wherein she claimed that her September 17, 2015, influenza vaccine caused CIDP. *See generally* Petitioner's Petition at 1, ECF No. 1. Ms. Apuzzo made no other vaccine injury claim. *Id.* After completing discovery, in June of 2023, the parties moved for a ruling on the record. *Apuzzo*, 2024 WL 4534200, at *4. After the briefing completed, on September 20, 2024, Special Master Horner issued his decision denying entitlement

to Ms. Apuzzo because he determined that the record showed that she suffers from Sjögren's Syndrome, not CIDP, caused by her influenza vaccination on September 17, 2015. *See generally id.* In making this decision, he reviewed Ms. Apuzzo's two expert reports and respondent's three expert reports. *See generally id.*

## A

Ms. Apuzzo's experts are Dr. Nizar Souayah, M.D., and Dr. Samar Gupta, M.D. Each expert's findings are discussed in turn.

**Dr. Nizar Souayah's Findings.** Dr. Souayah is a neurologist. *Apuzzo*, 2024 WL 4534200, at *10. Dr. Souayah agrees that Ms. Apuzzo does not fit the traditional CIDP diagnostic criteria and concedes that her "diagnosis changed from CIDP and to small fiber neuropathy." *Id.* at *11. That said, Dr. Souayah believes that the only plausible temporal reason of when Ms. Apuzzo's symptoms appeared was the recent injection of the influenza vaccination. *Id.* at *16. So, with a "mosaic of autoimmunity" symptoms associated with CIDP (and other conditions), the cause must have been the influenza vaccination. *Id.* at *16–17. "[M]osaic of autoimmunity" was never defined, but presumably "refer[s] to the notion that autoimmunity is believed to be multifactorial, involving both genetic and environmental factors." *Id.* at *17.

**Dr. Samar Gupta's Findings.** Dr. Gupta is a rheumatologist. *Id.* at *13. While Dr. Gupta defers to Dr. Souayah on Ms. Apuzzo's neuropathic symptoms, he disagrees that her condition's cause is solely CIDP when her symptoms track with Sjögren's Syndrome, especially with the presence of Sjögren's Syndrome antibodies in her body. *Id.* at *14. Dr. Gupta concludes that Ms. Apuzzo's symptoms are "consistent with a vaccine induced illness." *Id.* at *17 (internal quotation marks omitted). That said, "Dr. Gupta did not explain any direct causal relationship between vaccination and Sjögren's syndrome," and instead deferred to Dr. Souayah's "mosaic of autoimmunity" causation theory, and to a generalized sense that Ms. Apuzzo's symptoms appeared post-influenza vaccination and thus must be connected to the immunization. *Id.*

## B

Respondent's experts are: Dr. Brian Callaghan, M.D.; Dr. Robert Lightfoot, Jr., M.D.; and Dr. Mehrdad Matloubian, M.D. Each expert's findings are discussed in turn.

**Dr. Brian Callaghan's Findings.** Dr. Callaghan is a neurologist. *Id.* at *11. Dr. Callaghan acknowledges that Ms. Apuzzo was initially diagnosed with Guillain-Barré Syndrome and later CIDP; but, to him, Ms. Apuzzo was falsely diagnosed with CIDP due to her series of symptoms not being aligned with current understandings of CIDP diagnoses. *Id.* at *12–13. Nonetheless, he does not present "alterative diagnosis," and urges that the lack of a "clear explanation" for Ms. Apuzzo "does not mean that CIDP must therefore be the diagnosis." *Id.* at *12.

**Dr. Robert Lightfoot, Jr.'s Findings.** Dr. Lightfoot was a rheumatologist; he is now deceased. *Id.* at \*14. Dr. Lightfoot's reasoning is consistent with Dr. Gupta's report in that Dr. Lightfoot agrees that the presence of Sjögren's Syndrome antibodies alone does not immediately mean a patient has that condition. *Id.* at \*15. But to Dr. Lightfoot, that point is medically irrelevant because Ms. Apuzzo claims that her influenza vaccination caused CIDP, and there is no causal relationship exemplified by her experts between Sjögren's Syndrome antibodies and CIDP. *Id.* Without further evidence that the Sjögren's Syndrome antibodies are an indicator of a pathophysiological role in Ms. Apuzzo's alleged CIDP illness, "[t]here is no clear evidence that the [antibodies are] causally related to the alleged CIDP." *Id.* (internal quotation marks omitted).

**Dr. Mehrdad Matloubian's Findings.** Dr. Matloubian is a rheumatologist. *Id.* Dr. Matloubian believes that Ms. Apuzzo—who was never tested for Sjögren's Syndrome antibodies prior to her September 17, 2015, influenza vaccination—started exemplifying symptoms of Sjögren's Syndrome prior to her immunization because of known hand arthritis. *Id.* at \*16. Moreover, "[c]onsistent with Dr. Gupta's opinion, Dr. Matloubian explained that both CIDP and small fiber neuropathy can be associated with Sjögren's [S]yndrome." *Id.* Therefore, given her hand arthritis as well as the association between Sjögren's Syndrome and CIDP, and other conditions, it is "appropriate[]" to label Ms. Apuzzo's condition as Sjögren's Syndrome, not CIDP. *Id.* Nevertheless, Sjögren's Syndrome "is not known to follow infection, including influenza infection, which makes it very unlikely that the [influenza] vaccine could cause Sjögren's [S]yndrome." *Id.* at \*18.

### III

On October 21, 2024, Ms. Apuzzo moved for review of Special Master Horner's decision. *See generally* Petitioner's Motion for Review of the Special Master's Decision, ECF No. 160. On November 15, 2024, Ms. Apuzzo filed the operative version of her Memorandum in Support of her Motion for Review. *See generally* Pet'r's Mot. On December 5, 2024, Respondent filed its Response in Opposition to Ms. Apuzzo's Motion for Review. *See generally* Respondent's Response to Petitioner's Motion for Review of the Special Master's Decision, ECF No. 169 [hereinafter Resp't's Mot]. On January 22, 2025, the Court held oral argument in this case.

### IV

Under the Vaccine Act, this Court reviews a Special Master's decision upon the timely request of either party. 42 U.S.C. § 300aa-12(e)(1)–(2). In reviewing such a request, this Court may:

(A) uphold the findings of fact and conclusions of law . . . ,
(B) set aside any findings of fact or conclusion of law . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . , or

(C) remand the petition to the special master for further action in accordance with the court's direction.

*Id*. § 300aa-12(e)(2)(A)–(C). "Fact findings are reviewed . . . under the arbitrary and capricious standard; legal questions under the 'not in accordance with law' standard; and discretionary rulings under the abuse of discretion standard." *Munn v. Sec'y of Dep't of Health & Hum. Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992). When reviewing findings of fact, the Court cannot "substitute its judgment for that of the special master merely because it might have reached a different conclusion." *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 718 (2009). Instead, if the special master's decision is "based on evidence in the record that [is] not wholly implausible, [the Court is] compelled to uphold that finding as not being arbitrary or capricious," *Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1338 (Fed. Cir. 2010)(quotation removed), because the Court will neither relitigate the factual record nor "assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses," *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011). In turn, "if the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision," the Court will rarely find reversible error. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2000) (internal quotation marks omitted).

## V

Ms. Apuzzo makes three arguments in favor of reversing Special Master Horner's decision. *See* Pet'r's Mot. at 11–20. First, Special Master Horner's review of the factual record was illegitimate because he supposedly diagnosed her as not suffering from CIDP, instead of simply determining whether her claimed injury was caused by her September 17, 2015, influenza vaccination. Second, Special Master Horner failed to give preferential weight to Ms. Apuzzo's treating physicians compared to the parties' expert reports. Third, Special Master Horner incorrectly accepted the parties' expert opinions that her symptoms preceded her receiving the influenza vaccination at issue. Effectively, as summarized by Ms. Apuzzo, all three issues amount to a single argument: Did Special Master Horner's review of the factual record, inclusive of the parties' expert reports, contravene binding precedent instructing special masters to not "conduct a differential diagnosis" by choosing one expert's opinion over another, "or over a combination of" expert and her treating physicians' opinions? *See generally* Pet'r's Mot. He did not for three reasons.

**One**. Special Master Horner was required to evaluate the reliability of the parties' expert reports because, in contrast to respondent's experts, Ms. Apuzzo's experts *did not* agreed on the proper diagnosis for her symptoms. *Pafford*, 451 F.3d at 1356; *see, e.g.*, *Apuzzo*, 2024 WL 4534200, at *16–17. Both of her experts, Dr. Souayah and Dr. Gupta, have differing explanations for her symptoms—with Dr. Souayah apprising that Ms. Apuzzo's condition *could be* CIDP, and Dr. Gupta agreeing with the majority of respondent's experts that Ms. Apuzzo's condition *could be*

Sjögren's Syndrome—and both experts, at bottom, generalize her medical condition as a "mosaic of autoimmunity," *see, e.g.*, *Apuzzo*, 2024 WL 4534200, at *16–17, a phrase neither of her experts define nor link to a "recognized 'injury'" of the influenza vaccine, *Lombardi.*, 656 F.3d at 1353. Instead, Dr. Souayah, for instance, merely notes the temporal relationship between when Ms. Apuzzo received her influenza vaccination and the onset of a "mosaic of autoimmunity" symptoms associated with CIDP (and other conditions), and how that would lead to a rational conclusion that the immunization caused her medical injury. *Apuzzo*, 2024 WL 4534200, at *16. But evidence of a temporal relationship between Ms. Apuzzo's symptoms and the immunization is insufficient when Ms. Apuzzo's experts never presented a *logical and consistent* "medical theory causally connecting the vaccination and the injury" in her expert reports. *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

Of note, respondent's experts—Dr. Callaghan, Dr. Lightfoot, and Dr. Matloubian—further highlight the inconclusivity of Ms. Apuzzo's symptoms. *E.g.*, *Apuzzo*, 2024 WL 4534200, at *12–16, *18. All three agree with Ms. Apuzzo's expert Dr. Gupta that her symptoms are inconclusive, potentially being Sjögren's Syndrome or another condition, and may have even occurred prior to vaccination. *Compare id.*, with *id.* at *25 (explaining that Ms. Apuzzo's expert, Dr. Gupta, determined that "petitioner's Sjögren's syndrome [originated] pre-vaccination.").

This case's facts are identical to *Lombardi*, where the petitioner's motion for review was denied, so precedent directs this case's outcome. There, "two experts that Lombardi retained specifically for this litigation differ[ed] in their opinions as to her injury." *Lombardi*, 656 F.3d at 1352 (internal quotation marks omitted). Here, Ms. Apuzzo's two experts retained specifically for this litigation differ in their opinions as to her injury. *See, e.g.*, *Apuzzo*, 2024 WL 4534200, at *16–17. There, "Lombardi ha[d] not argued that the three conditions [were] so similar that doctors consider[ed] them to be conditions along a spectrum of diseases." *Lombardi*, 656 F.3d at 1352 (internal quotation marks omitted). Here, Apuzzo's two experts have also not argued that her "mosaic of autoimmunity" conditions exist on a spectrum. As a result, Special Master Horner had to assume the phrase "may simply refer to the notion that autoimmunity is believed to be multifactorial, involving both genetic and environmental factors." *Apuzzo*, 2024 WL 4534200, at *17. There, "the government's experts refuted each of [Lombardi's supposed] diagnoses and proposed five other possible conditions that Lombardi may have suffered from." *Lombardi*, 656 F.3d at 1352. Here, respondent's experts did the same. *E.g.*, *Apuzzo*, 2024 WL 4534200, at *12–16, *18.

Consequently, like in *Lombardi*, "[i]n the face of such extreme disagreement among well-qualified medical experts . . . it was appropriate for the special master to first determine what injury, if any, was supported by the evidence presented in the record." *Lombardi*, 656 F.3d at 1352–53. Special Master Horner did just that, and no more, by determining that the preponderance of the evidence pointed to Sjögren's Syndrome, not CIDP, because the undefined term "mosaic of autoimmunity" was insufficient to establish causation due to immunization. *See generally Apuzzo*, 2024

WL 4534200. Doing so does not amount to diagnosing Ms. Apuzzo. Rather, like in *Lombardi*, "the special master merely found that [Ms. Apuzzo] had failed to meet her burden to show by a preponderance of the evidence that she suffered from" CIDP, "not merely a symptom or manifestation of an unknown injury." *Lombardi*, 656 F.3d at 1353. Special Master Horner, in short, properly evaluated this case under precedent. *Id.*

**Two**. Special Master Horner gave sufficient weight to the opinion of Ms. Apuzzo's treating physicians, and even assuming that he did not, the error was harmless. *No* treating physician ever definitively concluded that Ms. Apuzzo suffered from CIDP. *E.g.*, *Apuzzo*, 2024 WL 4534200, at *4–10; *see also id.* at *11 (noting that Dr. Souayah admitted that Ms. Apuzzo's "diagnosis changed from CIDP and to small fiber neuropathy."). Instead, CIDP was always only suspected, and her diagnosis changed constantly. *Id.* at *4–10; *see also id.* at *11. Indeed, at times, Ms. Apuzzo's physicians tentatively ruled out CIDP as a cause of Ms. Apuzzo's symptoms. *Id.* at *7 ("Dr. Vukic then noted that Dr. Brannagan does not believe petitioner has CIDP and therefore concluded that [t]he cause of her symptoms remains elusive." (internal quotation marks omitted)). In other words, the treating physician record is as "elusive" and uncertain as Dr. Souayah and Dr. Gupta's expert opinions. *Id.* Special Master Horner reasonably weighed the evidence before him, with special attention paid to the treating physician record, to determine that the record did not support a CIDP injury, *see, e.g.*, *id.* at *20–22, a determination "well within the discretion granted to the special master under the vaccine program," *Lombardi*, 656 F.3d at 1352 (citations omitted); *see also Cedillo*, 617 F.3d at 1338 (determining that, if a special master's decision is "based on evidence in the record that [is] not wholly implausible, [the Court is] compelled to uphold that finding as not being arbitrary or capricious." (quotation omitted)). Ms. Apuzzo's argument to the contrary is therefore misplaced.

**Three**. Special Master Horner did not violate precedent by determining that Ms. Apuzzo's condition existed prior to her September 15, 2017, influenza vaccination by choosing one expert's opinion over another, "or over a combination of" expert and her treating physicians' opinions. *See generally* Pet'r's Mot. Quite the opposite. Special Master Horner noted that both Ms. Apuzzo's expert, Dr. Gupta, and respondent's expert, Dr. Matloubian, agreed that her condition likely predated her immunization. *Apuzzo*, 2024 WL 4534200, at *16, 25–26. Finding a less arbitrary determination would be near impossible.

In sum, Special Master Horner neither violated precedent nor made arbitrary findings or fact. *Munn*, 970 F.2d at 870 n.10. Ms. Apuzzo's Motion for Review of Special Master Horner's decision, ECF No. 160, is therefore **DENIED,** and the Office of Special Master's decision, ECF Nos. 158, 159, is **AFFIRMED**. The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge